**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0480n.06
Filed: July 5, 2007

Nos. 05-5971, 05-6191, 05-6192, 05-6217

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| TERRANCE MOORE; PAULINO GUIZAR; | ) | MIDDLE DISTRICT OF TENNESSEE |
| JOSE FERNANDO MORAN OCEGUEDA; | ) | |
| and FERLANDIS HEROD, | ) | |
| | ) | |
| Appellants. | ) | |

Before: SUTTON and COOK, Circuit Judges; and GWIN, District Judge.[*]

SUTTON, Circuit Judge. A federal jury convicted Paulino Guizar, Ferlandis Herod, Terrance Moore and Jose Moran Ocegueda of conspiring to distribute five or more kilograms of cocaine, among other charges. The four now appeal their respective convictions and sentences, arguing that the government presented insufficient evidence of conspiracy, that various trial errors require their convictions to be overturned and that the district court erred in sentencing them. Because none of these arguments is convincing, we affirm.

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

I.

The evidence presented to the jury showed the following. Javier Zamora ran a marijuana and cocaine distribution network centered in Chicago. Zamora employed Phillip Pena-Santiago to transport the drugs from sources in downtown Chicago to Zamora's residence, which he used as a storage facility. And he employed Efren Lopez-Benitez to courier drugs from Zamora's residence to buyers in Michigan, including Jose Fernando Moran Ocegueda.

In April 2002, Zamora gave Lopez-Benitez eight to ten pounds of marijuana and told him to contact Ocegueda because "he could move it." JA 1350–51. Lopez-Benitez contacted Ocegueda and sold him the marijuana. Lopez-Benitez arranged another sale of drugs—this time half a kilogram of cocaine—to Ocegeuda from Zamora a while later.

In the early summer of 2002, Ocegueda approached Lopez-Benitez about buying five to seven kilograms of cocaine, which he planned to cut and sell for $26,000 a kilogram. They met at Zamora's house, and Zamora agreed to provide Ocegueda with the cocaine but Ocegueda "would have to wait." JA 1359. While discussing the delivery of the cocaine with Lopez-Benitez and Guillermo Alvarez-Garcia (another colleague) at a restaurant in Kalamazoo, Michigan, Ocegueda offered the use of a 1998 Plymouth Breeze. The Plymouth Breeze was useful for transporting drugs, Ocegueda explained, because it had a hidden compartment where the passenger-side airbag used to be.

In July, Zamora arranged to buy the cocaine from a supplier in Memphis, Tennessee. After Lopez-Benitez refused to retrieve Ocegueda's cocaine from Memphis, Zamora contacted Pena-Santiago, and he agreed to make the trip. On July 9, Lopez-Benitez picked up the Plymouth Breeze from Ocegueda, met with Pena-Santiago and taught him how to open the car's hidden compartment. Lopez-Benitez also gave Pena-Santiago a hand-drawn map showing him where to go in Memphis and the phone number of Paulino Guizar—Zamora's brother-in-law and Pena-Santiago's contact in Memphis. That night, after arriving in Memphis, Pena-Santiago called Guizar, arranged to meet him and rented a hotel room.

The two met the next day and scheduled a meeting with "the person holding the cocaine"—Ferlandis Herod. JA 770. Herod, who drove a red pick-up truck (a "red Ford Ranger truck," JA 1786), met the two at a gas station and directed them to follow him to a nearby cemetery. There, the three transferred the cocaine from the bed of Herod's pick-up to the trunk of the Plymouth Breeze, and Herod left.

All of this made Guizar upset because they now had "[t]oo many kilos of cocaine." JA 774. He made a series of phone calls, which prompted another meeting with Herod, this time outside Pena-Santiago's hotel. Herod offered to "take [back] as many [kilograms] as [they] were going to give him," JA 775, but left empty-handed because Guizar could not decide how much to return. Later that night, Guizar and Pena-Santiago met with Herod again at a gas station and followed him to his residence on Cleopatra Drive. They parked the Plymouth Breeze in Herod's garage, unloaded a portion of the cocaine and went into Herod's house for "a couple of minutes" to talk. JA 778–79.

Escorted by Herod on a blue Yamaha motorcycle, Pena-Santiago and Guizar returned to the hotel for the night.

The next day, July 11, Pena-Santiago and Guizar met two of Guizar's colleagues and purchased a vacuum-sealing, food-storage system from Sam's Club. After several phone calls, they met with Terrance Moore, who led them to a house on West Holmes Avenue. Eric Griffin, one of Moore's friends, owned the house and had agreed to let Moore use it to unload and store "some dope." JA 791, 1159. That night, Pena-Santiago and Guizar retrieved the cocaine they had left at Herod's house and put it in Griffin's garage. As payment for the use of Griffin's garage, Moore and Griffin received two to three kilograms of cocaine. At the same time, Moore gave a pistol to one of Guizar's colleagues, who handed it to Guizar, who handed it to Pena-Santiago, who in turn left the gun in the garage.

When everyone but Guizar and Pena-Santiago had left the garage, these two inventoried the remaining cocaine and determined that there was between 70 and 80 kilograms. Guizar and Pena-Santiago repackaged the cocaine using the vacuum-sealing system from Sam's Club, placed 12 to 15 kilograms in the gas tank of Guizar's truck and 7 kilograms in the hidden compartment of the Plymouth Breeze. At that point, Guizar told Pena-Santiago to deliver the seven kilograms in the Plymouth Breeze to Nashville before restocking and returning to Chicago. Pena-Santiago also spoke with Zamora, who promised him "a truck plus a bunch of money" for completing the additional delivery. JA 811.

The next morning, July 12, Pena-Santiago left for Nashville in the Plymouth Breeze. About 50 miles outside of Nashville, an officer stopped Pena-Santiago for speeding and Pena-Santiago consented to a search of the car. During the search, Pena-Santiago called Zamora and told him that he had been pulled over for speeding but that the cocaine remained safely hidden. When the police discovered the cocaine hidden in the Breeze's compartment, they arrested Pena-Santiago, and soon after he agreed to cooperate.

At the urging of the police, Pena-Santiago placed several recorded telephone calls to Zamora, Lopez-Benitez and Guizar. Pena-Santiago told them he had been stopped for speeding and received a speeding ticket. He said the police had not found the hidden compartment (and the cocaine) but that they had impounded the Plymouth Breeze after finding marijuana in the trunk. Pena-Santiago also told Zamora that the police would release the vehicle only to its registered owner and that he needed money for a hotel room.

Zamora contacted Lopez-Benitez and told him to go to Nashville to pick up the Plymouth Breeze from the impound lot. Ocegueda also ordered Alvarez-Garcia and another person to go with Lopez-Benitez and called to check on their progress during the drive. Upon their arrival in Nashville, they went to Pena-Santiago's hotel to pick him up, but they were arrested instead.

Meanwhile, Moore called Griffin and told him to pick up Guizar, who was still staying at Griffin's house on West Holmes Avenue, and bring him to Moore's residence in Mississippi. Because Griffin "didn't know if police were coming or not," he did not have much time to check and

see if all the drugs had been removed from his garage, but when Moore asked if Griffin and Guizar "[got] everything out of the house," Griffin said they had. JA 1174. That evening the police searched Griffin's property and found empty kilogram wrappers in the trash can, a hotel receipt for "Phillip Pena," JA 1305, an instructional video for using a vacuum-sealing system and an old bill addressed to "Terrance Moore," JA 1313.

On July 28, 2004, the government filed a fourth superseding indictment charging Guizar, Herod, Moore and Ocegueda (among others) with conspiracy to possess five or more kilograms of cocaine with intent to distribute, *see* 21 U.S.C. § 846, and Guizar, Herod and Moore with possession of five or more kilograms of cocaine with intent to distribute, *see* 21 U.S.C. § 841(a)(1). A federal jury convicted all four of conspiracy, Herod and Guizar of possessing five or more kilograms of cocaine with intent to distribute and Moore of the lesser-included offense of possessing less than five kilograms of cocaine with intent to distribute.

Based on Guizar's extensive involvement in the conspiracy and his leadership role in orchestrating the movement and storage of the cocaine in Memphis, the district court sentenced him to 300 months' imprisonment. Because Herod had twice been convicted of felonies involving cocaine, the district court sentenced him to a mandatory sentence of life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A). The district court noted that Moore was unaware that the conspiracy involved 70 to 80 kilograms of cocaine, adjusted Moore's guidelines range and sentenced Moore to 188 months' imprisonment, a sentence at the top of the adjusted range. The district court attributed to Ocegueda a supervisory role because he "was the one who secured persons to transport the drugs

and made arrangements and was part of the process of recovering the drugs," JA 2158C, and gave

him an obstruction-of-justice enhancement—all leading to 240 months' imprisonment.

II.

Guizar, Herod, Moore and Ocegueda claim the evidence does not support the verdict—in

particular because it does not show that they entered into a single conspiracy. They face a difficult

burden—we cannot overturn the conviction if "*any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319

(1979)—one they ultimately cannot meet. As shown, the government presented a convincing tale

of conspiracy to move at least five kilograms of cocaine from Memphis to Michigan. The

government's lead witness, Pena-Santiago, identified each defendant as a member of the conspiracy

and testified about the specific roles of each defendant: Ocegueda was the buyer, who provided the

Plymouth Breeze that surreptitiously would convey the cocaine from Memphis to Michigan; Herod

was the source, who supplied the cocaine to Pena-Santiago and stored the excess cocaine until Pena-

Santiago and Guizar moved it to Griffin's garage; Guizar was Zamora's confidante in Memphis, who

oversaw the operation there and connected Pena-Santiago with Herod; and Moore was the middle-

man, who arranged for the storage of the excess cocaine in Griffin's garage. Despite repeated

attempts to undermine Pena-Santiago's credibility at trial, the jury evidently found Pena-Santiago

to be a credible witness, perhaps because his account was bolstered by the testimony of co-

conspirators Alvarez-Garcia, Griffin and Lopez-Benitez. Presented with this detailed account of a

conspiracy to smuggle at least five kilograms of cocaine from Memphis to Michigan, a rational juror

could find Guizar, Herod, Moore and Ocegueda guilty beyond a reasonable doubt of a single conspiracy.

### III.

Guizar, Herod, Moore and Ocegueda complain that several trial errors—the improper admission of evidence, the delayed disclosure of impeachment materials, improper closing arguments—so prejudiced the defense as to make a new trial necessary. We review the district court's factual findings for clear error, its legal conclusions de novo and any evidentiary rulings for abuse of discretion. *See United States v. Smith*, 73 F.3d 1414, 1416 (6th Cir. 1996); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

### A.

Herod complains that Pena-Santiago should not have been allowed to identify him in court because the identification was the result of an "unnecessarily suggestive" identification procedure. "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). To succeed on such a claim, then, a defendant must show two things—that the pretrial procedure was "unduly suggestive" and that there was insufficient "independent indicia of reliability." *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986).

Herod cannot satisfy these requirements. After his arrest, Pena-Santiago spent several weeks helping DEA agent Billy Joe Mundy to identify locations and witnesses and to sort through the scope and extent of the conspiracy. Although Pena-Santiago could not identify Herod by name, he explained to Agent Mundy that Herod lived in a "new house with [a] brick garage," JA 982, and that there should be a "red Ford Ranger truck" parked out front, JA 1786. On July 16, just four days after his arrest, Pena-Santiago and Agent Mundy drove to Memphis to identify the house where the excess cocaine was first stored. Upon turning onto Cleopatra Drive, Pena-Santiago identified Herod's "red Ford Ranger, . . . extended cab truck" immediately, JA 1786–87, and identified the house next to it as Herod's. Agent Mundy noted the address and took down the truck's license plate number. When asked, Pena-Santiago could not give Agent Mundy details about the inside of Herod's garage, though he remembered that "it had a motorcycle in it." JA 983.

During the investigation, Agent Mundy asked Pena-Santiago to identify photographs several times, always using the same procedure: Agent Mundy took out a photograph and placed it "in a folder face down on the table"; Agent Mundy told Pena-Santiago that, if he recognized the person in the picture, he should explain "where [he] recognize[d] [the person] from, [and] any name [he] may know [the person] by"; Agent Mundy then turned over the photograph and let Pena-Santiago talk. JA 1847. Using this procedure, Pena-Santiago identified a photograph of Zamora on July 17, and photographs of Zamora, Lopez-Benitez, Guizar and another conspirator on July 22. But Pena-Santiago was not able to identify every photograph—including several pictures of Zamora's relatives. On July 31, Agent Mundy showed Pena-Santiago at least two photographs using this

procedure: one was a black-and-white copy of Herod's driver's license photograph, *see* JA 155, which Agent Mundy had obtained by using the license plate number on Herod's truck; the other was of Griffin. Pena-Santiago identified both photographs, though he could only describe Herod as the man who lived on Cleopatra Drive because he admitted that he never learned Herod's name. On May 6, 2003, after Herod was arrested and photographed, Agent Mundy asked Pena-Santiago to identify this new photograph, *see* JA 159, which he did immediately. Pena-Santiago also identified Herod at trial.

"Although identifications arising from single-photograph displays may be viewed in general with suspicion," *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977), Pena-Santiago's pretrial identification of Herod was not unduly suggestive. *First*, the context of a multi-member conspiracy spanning at least four States and dozens of individuals undercuts the possibility that the identification procedure was unnecessarily suggestive. Unlike the typical identification situation in which an eyewitness is asked to identify a single person, Pena-Santiago had dozens of individuals to choose from in identifying the photographs given to him.

*Second*, Herod forgets that Pena-Santiago repeated this procedure many times, making the procedure, to some extent, the functional equivalent of a large photograph array. And Herod does not argue that Agent Mundy engaged in suggestive tactics in conjunction with the procedure: No one argues that Agent Mundy suggested that the driver's license photograph depicted Herod nor that Agent Mundy and Pena-Santiago were talking about Herod shortly before the identification occurred.

- 10 -

He instead asks us to hold that every identification through a "single photo display" is unduly suggestive as a matter of law, Br. at 38, which we decline to do.

*Third*, Pena-Santiago's extensive contacts with Herod greatly diminish any risk of misidentification. Pena-Santiago had many opportunities to observe Herod: first at a Memphis gas station, next at a cemetery to transfer the cocaine, next outside Pena-Santiago's hotel when Herod first offered to take back some of the cocaine, next at a different gas station from which Herod escorted Pena-Santiago to his house on Cleopatra Drive, then at Herod's house where they unloaded the cocaine and talked inside for "a couple of minutes," JA 778–79, and finally when Pena-Santiago retrieved the cocaine from Herod's garage the next night. Pena-Santiago not only saw Herod several times, the two also spent considerable time working with each other—transferring the cocaine from Herod's truck to the Plymouth Breeze, unloading the cocaine in Herod's garage and reloading the cocaine into the Breeze—not to mention the time they spent chatting inside Herod's house the first night. The district court did not abuse its discretion in admitting the identification.

B.

Moore contends that the government's delayed disclosure of certain medical records and payments made to Pena-Santiago by government sources violated *Brady v. Maryland*, 373 U.S. 83 (1963). Before trial, the government disclosed that the DEA gave Pena-Santiago regular payments for his help in the pending case and that Pena-Santiago was receiving mental health counseling. At trial, the government also disclosed that several local sheriff's departments paid Pena-Santiago to

assist in drug busts. Also at trial, Pena-Santiago admitted that he suffered from occasional blackouts "a long time" ago, JA 1014, prompting Moore and his co-defendants to seek Pena-Santiago's mental health records.

Before we will overturn this verdict, Moore must show that the information withheld was both material and exculpatory—that "there is a reasonable probability that, had the evidence been disclosed to the defense [earlier], the result of the proceeding would have been different." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted). Moore cannot meet this burden. Moore has not shown that the government failed to disclose any information about Pena-Santiago's medical history—the government after all disclosed before trial that Pena-Santiago was engaged in mental health counseling and the specific records requested by Moore were not in the hands of the government but in the hands of a private mental health facility. Nor has he shown how any delay by the government in producing these materials prejudiced his defense. Defense counsel attempted to impeach Pena-Santiago's testimony by repeatedly stressing to the jury that Pena-Santiago expected to benefit from his cooperation, *see* JA 973, 1056, that the DEA paid Pena-Santiago's expenses in return for his assistance, *see* JA 964, 1019–20, 1050, that Pena-Santiago had a "lot of drug history" as both a courier and a user, JA 950, and that Pena-Santiago had received substantial mental health counseling, *see* JA 1007. Defense counsel also wove the disclosed information into their cross-examination, asking Pena-Santiago about his work with law enforcement in conducting controlled buys, about his blackouts, and about his admissions to his mental health counselor. Given that defense counsel cross-examined Pena-Santiago on these very issues and given

that Moore has not shown how he would have cross-examined Pena-Santiago differently had he received the materials earlier, he has not shown prejudice.

C.

Guizar, Herod, Moore and Ocegueda claim that Agent Mundy bolstered Pena-Santiago's credibility with hearsay and that the district court's limiting instruction did not cure the problem. Out of the 176 pages of Agent Mundy's trial testimony, the defendants isolate three sets of potentially problematic statements. First, when questioned why he did not ask Pena-Santiago to make a "controlled delivery of the drugs" to his contact in Nashville, Agent Mundy said that Pena-Santiago was "to deliver [the drugs] to an unknown individual . . . in Nashville" but "evidently . . . believed that there was a car chase behind him." JA 1759–60. Second, while explaining how the police obtained a warrant to search Griffin's house on West Holmes Avenue, Agent Mundy mentioned that Pena-Santiago stated he had "left [the remaining cocaine] at that address" and that "no drugs" were left at Herod's house on Cleopatra Drive. JA 1776–78. Third, while explaining Pena-Santiago's identification of Herod's house, Agent Mundy explained that Pena-Santiago told him about a truck, that Pena-Santiago directed him to the house and that Pena-Santiago identified Herod's truck and house upon arrival. After an extended bench conference, the district court declined to grant a mistrial and instructed the jury "to consider those statements only as to identification of any of the defendants or other persons and any statements by Mr. Pena concerning identification of a place." JA 1826.

- 13 -

In the absence of a relevant exception, the Federal Rules of Evidence prohibit the admission of hearsay evidence. *See* Fed. R. Evid. 802. But even the improper admission of hearsay evidence does not invariably warrant a retrial. *See* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). This is a case in point. Some of these statements were harmless and hardly had the potential to cause "staggering prejudice." Herod Br. at 55. No one, for example, has contested that Pena-Santiago was on his way to Nashville to deliver the cocaine seized from the Plymouth Breeze, and his belief "that there was a car chase behind him" is simply irrelevant to the defense. Agent Mundy also was entitled to explain his own actions: why he declined to try a "controlled delivery" of the drugs, why he sought a search warrant for Griffin's house but not Herod's and how he discovered Herod's license plate number, which led to Herod's identification.

The district court's limiting instruction, moreover, covers several of the statements. None of the defendants objected to the formulation of this instruction at the time, and none now argues that he was unduly prejudiced by this identification evidence. Any bolstering of Pena-Santiago's credibility by these three remarks also was cumulative. Co-conspirators Alvarez-Garcia, Griffin and Lopez-Benitez corroborated Pena-Santiago's story; the government had already shown that Pena-Santiago identified first Herod's house and then Herod's photograph without prompting; and the jury already knew that Agent Mundy credited Pena-Santiago's testimony (he was after all the government's chief witness).

D.

Guizar, Herod, Moore and Ocegueda all claim that the government unduly prejudiced their defenses by offering improper testimony analyzing the telephone records in the case and that the district court's limiting instructions did not cure the problem. The government introduced 19 different phone records, including bills and printouts of raw calling data, to corroborate the testimony of Pena-Santiago, Alvarez-Garcia, Griffin and Lopez-Benitez that the defendants communicated frequently throughout the conspiracy via telephone. *See* JA 2176–2406 (Gov't Exs. 1A–19A). The district court provisionally admitted the records after the government authenticated them through the records' custodians at several phone companies and ultimately redacted them so that only "calls made within the conspiracy period" along with the "subscriber ID" remained. JA 1898. The government asked two officials to summarize the records. The district court ultimately struck the testimony of the first official, Drug Enforcement Agent Madeline Del Fratt, and overruled objections to the second official, Agent Mundy, who explained how the phone records supported the testimony of Pena-Santiago, Alvarez-Garcia, Griffin and Lopez-Benitez as to specific phone calls.

Contrary to defendants' contention, the mere *initial* introduction of the telephone records did not unduly prejudice their cases. *First*, the district court did all it could to minimize any prejudice arising from the volume of telephone records: It permitted only "those pages" of the telephone records "that deal with calls between" the conspirators' "phones on the dates involved in the conspiracy" into evidence, JA 1740; and when it suggested even greater redactions, such as requiring

the government to black out all calls not testified to by its witnesses, Ocegueda objected (while Guizar, Herod and Moore voiced no opinion on the matter).

*Second*, the district court limited the telephone records to corroborating the particular phone calls attested to by government witnesses, and the government showed that the conspirators had access to the phones and that the records corroborated each witness's testimony. *Compare, e.g.*, JA 756 (Pena-Santiago's testimony that Zamora called him at his girlfriend's house on July 9, 2002), *with* JA 2190 (Ex. 2A, phone of Pena-Santiago's girlfriend); JA 2259 (Ex. 8A, phone of Zamora); *and* JA 1908–09 (Agent Mundy pointing out that Ex. 2A shows a call to Ex. 8A on July 9). While the government did not present direct evidence about who possessed one of the phones, *see* JA 2397 (Ex. 19A, phone registered to "American Rivers"), a jury could reasonably infer that Herod possessed it: It was registered to an address in Memphis, where Herod lived; consistent with Pena-Santiago's testimony, it connected seven times to Pena-Santiago's phone on July 10 (the first night in Memphis), seven times to Guizar's phone that night, once to Pena-Santiago's phone the next evening (when they returned to Herod's house to retrieve the excess cocaine), and four times to Guizar's phone that evening; and it was used several times that month to call Herod's mother. While it may be true that the phone identified in one exhibit, JA 2391–95 (Ex. 18A, phone of Herod), neither placed calls nor received calls from co-conspirators, Herod forgets that the jury was instructed to ignore such records, *see* JA 1669 ("Insofar as there is testimony [of] telephone calls, or at least the dialing of telephone numbers to another number, . . . you are to consider that evidence

only [in] conjunction with the testimony of witnesses about actual telephone calls."), and he never explains how the introduction of an irrelevant exhibit could—or would—prejudice him.

To the extent Guizar, Herod and Ocegueda challenge the admission of the telephone records as hearsay, they disregard the fact that business records, including computer data compilations that are not printed out until trial, are an exception to the hearsay rule in federal court, Fed. R. Evid. 803(6); *United States v. Salgado*, 250 F.3d 438, 452 (6th Cir. 2001), and that business records are considered non-testimonial for purposes of the Confrontation Clause, *see Crawford v. Washington*, 541 U.S. 36, 56 (2004). The custodians attested to how the telephone records were compiled and to their accuracy, *see, e.g.*, JA 633–39, and when Herod said that some of the raw data might be inaccurate, the district court struck that record from the evidence out of an abundance of caution.

The defendants also claim that Agent Del Fratt's testimony summarizing the telephone records, which the district court ultimately struck from the record as unreliable, warranted a mistrial. But the district court told the jury to "strike, to the extent practicable[,] . . . any notes that [it] took on her testimony," JA 1748, and warned that "[i]t would be a violation of [their] sworn duty as jurors to consider that testimony," JA 1747. This stern instruction and our normal presumption "that jurors follow their instructions," *United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001), by themselves suffice to defeat this argument.

E.

Ocegueda argues that the information about his prior drug transactions with Lopez and Zamora amounted to inadmissible character evidence under Rule of Evidence 404(b) and unduly prejudicial evidence under Rule 403. The problem for Ocegueda is that the prior transactions were not admitted as character evidence but to show "each co-conspirator's knowledge of the others and their involvement in illegal drugs and their intent to enter into the conspiracy to deal in illegal drugs, specifically cocaine. So only for that limited [purpose]." JA 1350. None of these purposes suggests that Ocegueda's character was in play. This evidence also did not violate Rule 403's bar on unduly prejudicial evidence, given the relatively small quantity of drugs in these transactions (half a kilogram of cocaine, 8–10 pounds of marijuana) compared to the vast quantities of drugs involved in the main conspiracy (70–80 kilograms of cocaine) and the extensive testimony of the co-conspirators as to Ocegueda's involvement.

F.

Ocegueda argues that one officer's testimony about actions he took in response to the tip of a confidential informant was inadmissible and violated his Confrontation Clause rights. Not true. The statements of the confidential informant were never admitted into evidence. And even if the jury could infer what the confidential informant said from the officer's actions, the inferred statement was not admitted for the truth of the matter asserted but for showing the officer's actions in response to the tip. Because the federal hearsay rules and the Confrontation Clause protect only statements

"offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801; *see Crawford*, 541

U.S. at 59 n.9, the district court properly admitted the officer's testimony.

G.

Ocegueda claims that his Sixth Amendment right to counsel was violated when jailhouse

informants testified that he confessed to them. Although the government may not, through "secret

interrogation by investigatory techniques that are the equivalent of direct police interrogation," solicit

information from a defendant after he has been arrested and invoked his right to counsel, *Kuhlmann*

*v. Wilson*, 477 U.S. 436, 459 (1986), the circumstances surrounding Ocegueda's multiple confessions

did not amount to a police interrogation. None of the informants was sent to interrogate Ocegueda,

and none was promised any benefit for information before Ocegueda confessed. *See* JA 1505B (one

informant stated that he had "never known anybody got any help" from snitching), JA 1505E

(another informant said he approached the government with the confession), JA 1505J (another was

"never promised nothing"), JA 1505O (another said he "could" get help by providing information

to the government). Perhaps more importantly, Ocegueda must "demonstrate that the police and

their informant took some action, beyond merely listening, that was designed deliberately to elicit

incriminating remarks," *Kuhlmann*, 477 U.S. at 459, a showing he cannot make since the informants

never solicited Ocegueda for information. Instead, Ocegueda volunteered the information each time,

either directly to the informant or to someone within earshot. *See* JA 1517, 1542, 1562, 1585–86.

- 19 -

H.

Ocegueda complains that the district court should have declared a mistrial when Moore's counsel said in his closing argument that "I believe that you will come to a guilty verdict for some people, but I think that you will come to an innocent verdict for Terrance Moore." JA 2119–20. But in context this argument represented a small part of counsel's contention that Moore should not be found guilty by association, an argument a defendant surely may make in a conspiracy trial.

A greater bar to this argument is Ocegueda's failure to object to the statement at trial, *see* JA 2120, requiring us to look at the contention through the lens of plain-error review. Fed. R. Crim. P. 52(b). Even if we accepted Ocegueda's contention that Moore's counsel was essentially a "second prosecutor," Br. at 44, counsel's statement was nothing more than an "isolated remark[] . . . made in the course of a long trial." *United States v. Solivan*, 937 F.2d 1146, 1156 (6th Cir. 1991). At most, the remark was a prediction of how the jury *would* act (not an opinion as to how the jury *should* act). At worst, the statement was a rhetorical flourish showing that counsel thought that if anyone should be acquitted, it should be his own client, Terrance Moore. Given the extensive evidence against Ocegueda—including the testimony of Pena-Santiago, Lopez-Benitez and Alvarez-Garcia—there is little likelihood that counsel's statement affected the jury's deliberations.

I.

Guizar, Herod, Moore and Ocegueda argue that they were denied a fair trial by the accumulation of trial errors. Because the alleged errors were not in fact errors or were largely harmless, the trial as a whole was not fundamentally unfair to the defendants.

IV.

Guizar, Herod, Moore and Ocegueda also challenge their sentences. We review constitutional challenges to a sentence de novo, the findings of fact used to enhance a sentence for clear error and the actual sentence imposed for a reasonable application of 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 261–62 (2005). *See also Rita v. United States*, 551 U.S. ___, No. 06-5754, slip op. at 11 (U.S. June 21, 2007) ("[A] Guidelines sentence will usually be reasonable[] because it reflects both the Commission's and sentencing court's judgment as to what is an appropriate sentence for a given offender."); *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006) (adopting a "rebuttable presumption of reasonableness" for sentences within the "properly calculated" guidelines range).

A.

Herod and Guizar claim that their sentences are unconstitutional because the district court relied on facts not found by a jury beyond a reasonable doubt. As we have held before, *see, e.g.*,

*United States v. Watford*, 468 F.3d 891, 915 (6th Cir. 2006), *Booker* disposed of this argument by making the guidelines advisory rather than mandatory.

## B.

Moore challenges his 188-month sentence, at the top of the 151–188 month guidelines range, as substantively unreasonable. But: Moore was an essential link in the conspiracy; he introduced Guizar and Pena-Santiago to Griffin; he obtained Griffin's permission to use the West Holmes Avenue house to unload and store the cocaine; Moore and Griffin received two to three kilograms of cocaine for these services; and when Moore learned that Pena-Santiago had been arrested, he directed Griffin to pick up Guizar from the West Holmes Avenue house and bring him to Mississippi. Moore, indeed, was a substantial contributor to the conspiracy, and given the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), 188 months' imprisonment was reasonably necessary to "provide just punishment" and to "afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(A)–(B).

## C.

Ocegueda argues that the district court erred in enhancing his guidelines range based on his role in the offense and his obstruction of justice and that his sentence of 240 months' imprisonment was unreasonable under *Booker*. The district court properly characterized Ocegueda as an "organizer, leader, manager, or supervisor" in the conspiracy, U.S.S.G. § 3B1.1(c), because Ocegueda "wanted to purchase the drugs[,] . . . secured persons to transport the drugs and made

arrangements and was part of the process of recovering the drugs." JA 2158C. Ocegueda (a) contacted Zamora about buying the cocaine, (b) provided the Plymouth Breeze, (c) instructed Lopez-Benitez about how to use the hidden compartment to transport the drugs and (d) sent Lopez-Benitez, Alvarez-Garcia and one other to pick up the Breeze after Pena-Santiago was arrested. Together these actions amply support the conclusion that Ocegueda acted in a supervisory role. *See* U.S.S.G. § 3B1.1 cmt. n.4; *see also United States v. Gates*, 461 F.3d 703, 708–09 (6th Cir. 2006).

An obstruction-of-justice enhancement is appropriate when "the defendant willfully . . . attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1(A). Ocegueda sent a note to a co-defendant telling him to "take care of" a "snitch[]," JA 2156, a statement the district court construed to be an attempt to silence a potential witness. JA 2158C (Ocegueda "was intending to convey to others that he would do harm to a person who would testify against him."); *see* U.S.S.G. § 3C1.1 cmt. n.3. Despite Ocegueda's argument to the contrary, guideline section 3C1.1 clearly covers attempts to obstruct justice, and whether or not there must be "some likelihood" of success before the guideline can apply, *see United States v. Brooks*, 957 F.2d 1138, 1149–50 (4th Cir. 1992), that standard was more than met here: The suspected snitch had been housed in the same jail as Ocegueda; the note could have been passed to a co-conspirator; and Ocegueda reasonably expected that the co-conspirator could "take care of" the suspected snitch. The district court had no reason to accept Ocegueda's characterization of the note as an attempt to instruct his co-conspirator to provide "comfort and assistance" to the suspected snitch. Br. at 51.

Ocegueda's sentence of 240 months' imprisonment was a reasonable application of section 3553(a). The district court properly calculated Ocegueda's guidelines range to be 210–262 months, JA 2159, and Ocegueda has given us no persuasive reason to overturn the district court's considered application of section 3553(a); *Rita*, slip op. at 16 ("[W]here judge and Commission *both* determine that the Guidelines sentence[] is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)."). He points to the lower sentences of Lopez-Benitez and Zamora, presumably to show that the district court did not "avoid unwarranted sentence disparities among defendants with similar records." 18 U.S.C. § 3553(a)(6); *see* Br. at 52. But Ocegueda, Lopez-Benitez and Zamora were not three peas in a pod. Neither Lopez-Benitez nor Zamora attempted to threaten a potential witness. And both of them accepted responsibility for their actions and pleaded guilty, *see* Docs. 150, 494, while Lopez-Benitez substantially assisted the government in prosecuting the case. Because the three were not similarly situated, the district court had no basis for sentencing them similarly.

V.

For these reasons, we affirm.