NOT FOR PUBLICATION
File Name: 08a0148n.06
Filed: March 14, 2008

NOs. 07-5004; 07-5005

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

RITA FAYE TIPTON, GLORIA
ANN WILLIAMS,

       Defendants-Appellants.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

_____/

BEFORE: SUHRHEINRICH and ROGERS, Circuit Judges; and BELL, District Judge.[*]

**SUHRHEINRICH, Circuit Judge.** Following a jury trial, Defendants-Appellants Rita Faye Tipton ("Tipton") and Gloria Ann Williams ("Williams") (collectively "the Defendants") were convicted of: (1) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; (2) tax evasion, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2; and (3) mail fraud, in violation of 18 U.S.C. § 1341. On appeal the Defendants raise various challenges to their convictions on the conspiracy charges, and challenge their sentences. For the reasons that follow, we **AFFIRM** their convictions and sentences.

## I. BACKGROUND

In the mid-1980s Tipton formed Jackpot Charity Bingo ("Jackpot"), a bingo gaming facility

---

[*]The Honorable Robert H. Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

in Waco, Kentucky. She owned and operated the business while her sister, Williams, worked for charities that held bingo sessions at Jackpot. In 1992, Tipton transferred ownership of Jackpot to her son.

New efforts at regulating the Kentucky bingo industry took effect shortly thereafter, including a new state law requiring separation between bingo halls and the charitable organizations that hold bingo sessions at the bingo halls. *See* Ky. Rev. Stat. § 238.500. One provision required that immediate family members of the owners of bingo halls refrain from participation in any gaming activity. *See* Ky. Rev. Stat. §§ 238.505(20); 238.555(3). The law also required that bingo halls maintain specific records and submit quarterly reports to the Office of Charitable Gaming ("OCG"), the administrative agency charged with overseeing charitable bingo operations. *See* Ky. Rev. Stat. §§ 238.550(7); 238.555(6); 238.510.

Though prohibited from involvement in charitable gaming activity due to her son's ownership of Jackpot, Tipton continued to participate in Jackpot operations. In February of 2000, the OCG began an investigation of Jackpot after receiving allegations that Tipton and members of her family, including Williams, were simultaneously operating both the bingo hall and the charities, engaging in "under the table" gambling, and withholding profits from the charities for their own personal gain.

The investigation proceeded in three stages. First, a review of the bank records of charities holding bingo at Jackpot revealed that: Williams had signature authority for the charitable gaming bank accounts for charities holding bingo sessions at Jackpot; there was a commingling of funds between Jackpot and the charities; and Tipton and Williams had cashed checks drawn on Jackpot's account for personal expenses.

Second, undercover surveillance of Jackpot operations in March of 2000 revealed that Williams and Tipton were engaged in the sale of gambling tickets known as "pull-tab cards" at Jackpot.[1] Despite Kentucky Administrative Regulations requiring that pull-tab cards be purchased from state-licensed distributers in Kentucky, *see* 820 Ky. Admin. Regs. 1:032, OCG investigators found that Tipton enlisted her brother to travel to Ohio to purchase the illegal pull-tab cards. In addition, surveillance of Jackpot operations on one evening led OCG investigators to conclude that $2,439 in gaming funds were unaccounted for during that day's bingo session.

Third, OCG agents reviewed statements provided by various casinos detailing Tipton and Williams's wins and losses at their establishments, which revealed that the Defendants were wagering funds in excess of what the income as disclosed on their state tax returns would allow. The financial data concerning the Defendants' win/loss records was based on the "players club cards" that Tipton and Williams inserted into slot machines as they wagered money at the casinos. The casinos reported that between 1998 and 2001, Tipton and Williams both lost thousands of dollars. Despite experiencing large financial losses at the casinos, Tipton and Williams reported little or no income from 1998 to 2001 on their state income tax returns. Tipton's tax returns reported only income of small amounts of interest and capital gains, and Williams's returns reported Social Security benefits and small amounts of interest and capital gains. Based on its findings, the OCG referred the case to the Internal Revenue Service Criminal Investigation Division in July of 2001.

The IRS then began its own investigation. IRS investigators started their inquiry by

---

[1]Under Kentucky law, a pull-tab card is "a game of chance using a folded or banded paper ticket, or a paper card with perforated break-open tabs, the face of which is covered or otherwise hidden from view to conceal a number, letter, symbol, or set of numbers, letters, or symbols, some of which have been designated in advance as prize winners and shall include charity game tickets that utilize a seal card." Ky. Rev. Stat. § 238.505.

procuring the Defendants' federal tax returns. Next, a search of Tipton's curbside garbage was conducted, which uncovered: correspondence addressed to Jackpot; utility bills for Jackpot; pull-tab card sales records; correspondence addressed to a charity holding bingo sessions at Jackpot; and promotional material from various casinos. IRS investigators conducted video surveillance of Jackpot, and observed Tipton and Williams at Jackpot on eight out of the eleven nights that surveillance was conducted. Investigators also followed Tipton and Williams as they drove in separate vehicles to make a deposit at the bank where one of the charities maintained its gaming account.

On April 9, 2003, search warrants were executed at Tipton's and Williams's homes. When Tipton and Williams were interviewed, they acknowledged a penchant for gambling, but failed to report any type of employment or significant source of income. Tipton did not claim any alternative sources of cash.

An IRS investigator performed an investigative technique known as an "expenditure analysis" in order to determine Tipton's and Williams's unreported taxable income and tax liability from 1998 through 2001. An expenditure analysis notes discrepancies between an individual's documented expenses and reported income. According to the investigator that testified at trial, "[i]f [an individual] spend[s] more than [his or her] reported sources of income and [] non-taxable sources of income, then logically [there exists] another source [of income] that hasn't been disclosed." Based on this analysis, the IRS investigator concluded that Tipton had unreported income totaling $159,713.70 from 1998 through 2001, and owed $32,546 in unpaid taxes. The investigator also determined that Williams had $185,228.53 in unreported income during the same time period, and owed $48,856.75 in unpaid taxes.

On February 3, 2006, Tipton and Williams, as well as two other individuals, Cletis and Brenda Adams ("the Adamses"), were indicted for: (1) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; (2) tax evasion, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2; and (3) mail fraud, in violation of 18 U.S.C. § 1341. The Adamses, who are not parties to this appeal, both pleaded guilty to one count of tax evasion, and were sentenced to three months' imprisonment, and ordered to pay $61,663 in restitution.

Tipton and Williams filed a joint motion to dismiss the conspiracy charges, arguing that the alleged conspiracy should have been charged under the "offense clause" of 18 U.S.C. § 371, with the substantive offense being tax evasion, in violation of 26 U.S.C. § 7201. The district court denied the motion.

The jury found Tipton and Williams guilty on all counts. The district court sentenced the Defendants to 60 months' imprisonment on the conspiracy and tax evasion counts and 63 months' imprisonment on the mail fraud counts, with the sentences to run concurrently. Tipton was ordered to pay $32,546 in restitution, and Williams was ordered to pay $48,865 in restitution.

## II. ANALYSIS

### A. Sufficiency of the Indictment

Tipton and Williams first argue that the district court should have dismissed the indictment because they were improperly charged under the "defraud clause" of 18 U.S.C. § 371. We review the sufficiency of an indictment de novo. *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992).

The indictment charged the Defendants with conspiracy under 18 U.S.C. § 371. Section 371 reads in part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. Section 371 prohibits two types of conspiracy: (1) conspiracy to commit a specific offense ("offense clause conspiracy"); and (2) conspiracy to defraud the United States ("defraud clause conspiracy"). *United States v. Kraig*, 99 F.3d 1361, 1366 (6th Cir. 1996). The distinction is important because a conspiracy charged under the defraud clause does not require that the Government prove that "the conspirators were aware of the criminality of their objective." *United States v. Khalife*, 106 F.3d 1300, 1303 (6th Cir. 1997) (quoting *United States v. Collins*, 78 F.3d 1021, 1038 (6th Cir. 1996)).

The Defendants were charged with defraud clause conspiracy, the indictment providing that the Defendants:

unlawfully, willfully and knowingly conspire[d] and agree[d] together and with each other to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service (IRS) of the Treasury Department in the ascertainment, computation, assessment, and collection of revenue; to wit, income taxes.

In support of their contention that they should have been charged under the offense clause, the Defendants rely on *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989), for the proposition that a defendant must be charged under the offense clause when a specific statute describes the entirety of the offense conduct alleged to have been involved in a conspiracy. The Defendants argue that they should have been charged under the offense clause because their only act alleged as violating § 371 was their individual under-reporting of personal income, as prohibited by 26 U.S.C. § 7201.

In *Minarik*, this Court held that "the 'offense' and 'defraud' clauses as applied to the facts

-6-

[in that] case are mutually exclusive," and that because the facts as alleged by the government only violated one specific statute, 26 U.S.C. § 7206(4), the defendants should have been prosecuted under the offense clause. *Minarik*, 875 F.2d at 1187. Nonetheless, this Court has held that the holding of *Minarik* is confined to its facts. *See United States v. Sturman*, 951 F.2d 1466, 1473-74 (6th Cir. 1991); *United States v. Mohney*, 949 F.2d 899, 902 -05 (6th Cir. 1991); *Kraig*, 99 F.3d at 1367-68; *Khalife*, 106 F.3d at 1305-06. In *Khalife*, this Court held that "the *Minarik* requirement of mutual exclusivity is dicta," that "we have subsequently confined *Minarik* to its facts," and that "the law in this circuit does not require . . . that the conspiracy be charged only under the 'offense' clause of § 371." *Id*. at 1306.

*Minarik* is not controlling in this case. *Minarik*'s holding that the defendants in that case should have been charged under the offense clause was based on three unique factual circumstances:

> First, [in *Minarik*,] there was a great deal of confusion resulting from the government's shifting theories of prosecution and failure to clearly define the intent element in the indictment. The one-count indictment in *Minarik* vaguely charged the defendants with conspiring "to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury." . . .

> Second, the *Minarik* defendants' conduct consisted of one limited act of concealing the proceeds of a real estate transaction to prevent a levy upon the proceeds by the IRS. The breadth of the activity was not commensurate with the *Minarik* court's conception of a general conspiracy to defraud. . . .

> Third, the *Minarik* defendants' duties were sufficiently technical to warrant more specific notice[.]

*Khalife*, 106 F.3d at 1304 (citations omitted). In *Minarik*, those duties concerned the "technical and difficult"disclosure requirements regarding assets upon which an IRS levy may be authorized. *Minarik*, 875 F.2d at 1196.

The three factual circumstances found in *Minarik* are not present in this case. First, the indictment did not cause confusion as was the case in *Minarik*–where the Government "repeatedly shifted its theory of the case" and "used the defraud clause in a way that created great confusion about the conduct claimed to be illegal." *United States v. Hurley*, 957 F.2d 1, 3 (1st Cir. 1992) (citation omitted). In the indictment and throughout trial, the Government never deviated from its theory that the Defendants' conspiracy consisted of obtaining and failing to disclose proceeds from Jackpot operations. Second, unlike the *Minarik* defendants' conduct, the conduct alleged of the Defendants was not an isolated act, but rather an elaborate operation lasting several years. The Defendants' tax returns from 1999 through 2001 reflected their disclosure of little to no income–in contradiction of their alleged earnings from Jackpot operations. And third, unlike the *Minarik* defendants' pre- and post-levy disclosure requirements at issue in *Minarik*, the duties of Tipton and Williams are neither difficult nor technical. As this Court remarked in *Mohney*:

> Defendants clearly had a duty not to fail to file returns, not to file false returns, not to submit false statements and information, not to attempt to evade the assessment and payment of taxes, and not to generally conduct their business affairs in such a manner that the IRS would be impeded and impaired in its ascertainment, computation, assessment, and collection of revenue.

*Mohney*, 949 F.2d at 905. Because the unique circumstances found in *Minarik* do not apply here, we decline to depart from the general rule that the defraud and offense clauses are not mutually exclusive. *See Khalife*, 106 F.3d at 1306. Accordingly, the Defendants were properly charged under the defraud clause of § 371.

### B. Sufficiency of the Evidence

The Defendants next argue that the evidence was insufficient to support their convictions for conspiracy to defraud the United States. Challenges to the sufficiency of evidence are also reviewed

de novo. *United States v. Seymour*, 468 F.3d 378, 388 (6th Cir. 2006). "When reviewing the sufficiency of the evidence to support a criminal conviction, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caraway,* 411 F.3d 679, 682 (6th Cir. 2005) (internal quotation marks omitted). To prove conspiracy to defraud under § 371, the government must show "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States." *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005).

The Defendants argue that the Government failed to prove an agreement and the requisite intent to defraud the United States. With regard to the agreement, it "need not be explicit; rather, a 'tacit or mutual understanding among the parties will suffice.'" *United States v. White*, 492 F.3d 380, 395 (6th Cir. 2007) (quoting *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)). In interpreting the intent requirement of § 371, we have held that "[t]he intent element of § 371 does not require the government to prove that the conspirators were aware of the criminality of their objective"; rather, the Government must only "show that [the Defendants] knew of [their] liability for federal taxes." *United States v. Collins*, 78 F.3d 1021, 1038 (6th Cir. 1996) (citing *Ingram v. United States*, 360 U.S. 672, 678 (1959)).

Viewing the evidence in the light most favorable to the Government, a rational juror could conclude beyond a reasonable doubt that the agreement and intent elements of conspiracy were proven. The indictment alleged that the Defendants obtained proceeds from Jackpot operations, which they, in turn, failed to disclose to the IRS. With regard to the specific methods employed by

the Defendants in obtaining and hiding their undisclosed income, the indictment alleged that the

Defendants:

> A. Purchas[ed] "bootleg" Bingo pull tabs from out-of-state vendors to avoid having those purchases reported to the OCG. These bootleg pull tabs were then sold along with reported pull tabs and the extra proceeds skimmed and not reported to the OCG.
> B. Pa[id] "house winners," [who] were inside affiliates of the defendants, to win rigged pull tabs and return the winnings to the defendants.
> C. [Sold] Bingo packets for amounts in excess of that reported to the OCG and pocket[ed] the excess.
> D. Fail[ed] to deposit cash proceeds of Bingo games in the required bank account.
> E. Deposit[ed] personal checks of Bingo patrons, cashed at the Bingo Hall, into their personal accounts.

The Government presented exhibits as well as lay and expert testimony to support these allegations. For instance, the Government presented the testimony of Joe Byrd, who testified that he accompanied Tipton's brother to Ohio on multiple occasions in order to purchase pull tab cards not registered by the state of Kentucky, and that Tipton purchased her brother a van for the purpose of making weekly trips to purchase pull-tab cards in Ohio. Nancy Jackson, an OCG investigator, testified that during an evening while undercover surveillance was conducted, certain persons who had previously assisted in running bingo sessions at Jackpot were sitting together in front of the office door and were "the big winners of the night," and that on subsequent evenings, individuals sitting at this particular table constituted "a large percentage of [the] winners." Leah Cooper, the Assistant Director of the Division of Licensing and Compliance for the OCG, testified as to various violations of Kentucky law by charities holding bingo sessions at Jackpot, including the use of pull-tab cards that were not purchased from licensed distributers, the failure to report their use, and the failure to deposit the proceeds from the deals into the charity's bank account. OCG investigators testified that bank records indicated Williams had signature authority on the bank accounts of

-10-

charities holding bingo sessions at Jackpot, and that Williams wrote checks drawn on Jackpot's account to distributers of bingo supplies. Beverly Rogers, an OCG investigator, testified that while conducting undercover surveillance at Jackpot, she observed Williams "cashing checks" in the office. And an IRS investigator testified that both Tipton's and Williams's documented expenses far exceeded that which their income as disclosed on their federal tax returns would allow for.

The Defendants argue that the Government, at best, proved that "the Defendants independently under-reported their personal income on their individual tax returns," but not that "they were [even] aware of each other's alleged tax evasion." But an "agreement[] may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts, and the totality of their conduct." *United States v. Cueto*, 151 F.3d 620, 635 (7th Cir. 1998). Here, a jury could infer an agreement between the Defendants from the circumstantial evidence that the Defendants acted in concert while committing the allegations set forth in the indictment. And a jury could find that they were aware of their duty to report income to the IRS given that they filed signed tax returns for the years 1999 through 2001, which, according to the testimony of an IRS investigator, grossly understated their income. Contrary to the Defendants' assertion, a jury could infer that Tipton and Williams knew reached an agreement to defraud the United States based on their joint participation in efforts over a several year period to obtain and hide proceeds from Jackpot operations.

## C. Jury Instructions

The Defendants next claim that the indictment was constructively amended such that it was possible that the jury convicted them of conspiracy to commit state bingo fraud, rather than conspiracy to defraud the United States. The Defendants further contend that a prosecution under

§ 371 requires "a finding of intent and purpose to defraud the *IRS*," objecting that the jury instructions did not mention the IRS. The Defendants' arguments lack merit.

"A constructive amendment to the indictment occurs when 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986)). A defendant bears the burden of proof on this issue. *United States v. Rashid*, 274 F.3d 407, 414 (6th Cir. 2001). "A constructive amendment to the indictment constitutes a per se violation of the fifth amendment's grand jury clause." *United States v. Syme*, 276 F.3d 131, 148 (3d Cir. 2002) (internal quotation omitted).

The district court essentially followed the language set forth in Sixth Circuit Criminal Pattern Jury Instructions, Instruction 3.01A-Conspiracy to Commit an Offense-Basic Elements, in instructing the jury of the elements comprising conspiracy to defraud the United States. The district court was not required to admonish the jury that the Defendants intended to defraud the IRS specifically, because the district court correctly instructed the jury multiple times that the substantive offense was "conspiracy to commit fraud against the United States." Of course, the IRS is an administrative subdivision of the United States. "[T]he district court's instruction was a correct statement of the law and Defendant has not pointed to any authority suggesting otherwise." *United States v. Bucheit*, 134 Fed. App'x 842, 857 (6th Cir. 2005). Accordingly, the district court committed no error in its instruction as to the charge of conspiracy to defraud the United States.

## D. Exclusion of Expert Testimony

-12-

The Defendants raise two challenges to the district court's evidentiary determinations. We review the district court's evidentiary determinations, including those involving expert testimony, for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1218 (6th Cir. 1987).

First, the Defendants argue that the district court erred in excluding the testimony of Troy Farthing and Patsy Woolum, who would have testified as to the legitimacy of the charities that held bingo sessions at Jackpot. The Defendants mistake the record, which reflects that these witnesses were not precluded from testifying to the legitimacy of the charities. The record reflects that, with regard to testimony of Troy Farthing, the district court sustained the Government's objection under Fed. R. Evid. 404(b) with regard to the admissibility of his testimony concerning bad acts of Roger Alexander, a Government witness. The district court did not bar other testimony. The Defendants, on appeal, do not raise any claim with regard to the district court's Rule 404(b) ruling.

The district court record also reflects that Patsy Woolum was also not precluded from testifying as to the legitimacy of charities that held bingo sessions at Jackpot, and, in fact, actually testified regarding this matter. The Defendants presented Woolum, the former president of the Waco Ladies Auxiliary, who testified that the main source of funding for the charity was from bingo proceeds, and that the charity gave money to people in financial need, helped send children to camps, and purchased school supplies for school systems.

Second, the Defendants challenge the district court's exclusion of the testimony of William Farmer, an enrolled agent for the IRS authorized to represent people before the IRS in tax matters. He performed a "net worth/expenditure method analysis" to determine the taxes owed by the Defendants from 1999 through 2001. During a Fed. R. Evid. 104(a) hearing, Farmer explained that

his analysis depended on information provided by the Defendants regarding the amount of money they possessed. His analysis was based upon the Defendants' claim to possession of a cash hoard of $55,000, the existence of which Farmer did not verify.

Under Fed. R. Evid. 702, an expert may offer an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The Government argues that the district court did not err because Farmer was a "conduit" for the admission of inadmissible hearsay. An expert may, however, rely on hearsay in forming an opinion. *See Kingsley Assocs., Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1286-87 (6th Cir. 1990) (interpreting Fed. R. Evid. 703). We do not find an abuse of discretion in the district court's exclusion of Farmer's testimony. The district court has an "obligation to ensure that the basis of an expert's opinion is both reliable and reasonable." *Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 720 (6th Cir. 1999) (Suhrheinrich, J., concurring in part and dissenting in part). Farmer's proposed testimony was unreliable due to his failure to verify the facts upon which he based his calculations of the Defendants' tax liability. His opinions were based solely on the Defendants' self-serving statements regarding their assets. It appears likely in this case that the defense was simply attempting to use Farmer as a "conduit" for the admission of the Defendants' otherwise inadmissible hearsay statements regarding their assets. *See United States v. Stone*, 222 F.R.D. 334, 341 (E.D. Tenn. 2004). Lacking any indicia of reliability, the district court did not err in excluding the testimony.

### E. Calculation of Fraud Loss

The Defendants argue that the district court erred in its calculation of "loss" under U.S.S.G. § 2B.1, namely that its estimate "was unreasonable, excessive, inaccurate and founded solely on

unsupportable statistical speculation." Both of the Defendants' respective presentence investigation reports recommended applying a 16-level enhancement because the actual loss was more than $1,000,000 but less than $2,500,000.

"Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). But "whether those facts as determined by the district court warrant the application of a particular guideline provision is purely a legal question and is reviewed de novo by this court." *Id*. (quotations omitted).

Section 2B1.1 of the Guidelines is used in determining "loss" in fraud cases.[1] Under this section, the district court may estimate the amount of the fraud loss. In situations where the losses occasioned by financial frauds are not easy to quantify, the district court "need only make a reasonable estimate of the loss . . . based on available information." U.S.S.G. § 2B1.1, cmt. 3(C). And such estimates "need not be determined with precision." *Triana*, 468 F.3d at 320 (quoting *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003)).

The district court estimated a fraud loss of $1.4 million by extrapolating an average of the estimated amount of money made from the sale of unreported pull-tab cards on four nights in March of 2000 over a three-year period–from June of 1998 until June of 2001, at which time the Government admitted there was no longer evidence of the sale of unreported pull-tab cards.

An extrapolation method for estimating fraud loss best suits cases such as this, where the

---

[1]The commentary to U.S.S.G. § 2B1.1(b) states that "loss is the greater of actual loss or intended loss," where "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b), cmt. n.3(A)(i). "[R]easonably foreseeable pecuniary harm means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. at cmt. n.3(A)(iv).

fraud occurred over a long period of time, and a precise calculation of the loss is simply not feasible. As the Tenth Circuit has explained, "[r]equiring precise calculations which entail the gathering of documents that are diffuse and/or difficult to obtain would reward a defendant whose tax fraud was particularly complex and/or spanned a significant period of time." *United States v. Spencer*, 178 F.3d 1365, 1368 (10th Cir. 1999) (applying U.S.S.G. § 2T1.1, which provides for the computation of tax loss for tax evasion, failing to file a tax return, and filing a false return). Therefore, courts have approved of extrapolation methods for estimating fraud loss. *See, e.g.*, *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997) ("[I]t is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown.").

The Defendants contend that the figure used to extrapolate the total loss–the average daily profit from unreported pull-tab cards over a four-day period in March of 2000–was unreasonable because it was "such a small sample." They insist that the sample was "small" because it consisted of estimated profits from four out of 756 nights, or about 0.53 percent of the period in question. Operating under the premise that smaller sample sizes yield less reliable estimates, the Defendants argue that the extrapolated amount of total loss was inherently unreasonable. But we know of no case holding that a percentage below a specific statistical floor yields a calculation that is per se unreasonable. *See United States v. Scrivener*, 189 F.3d 944, 950 (9th Cir. 1999) (rejecting the proposition that "any percentage below twenty is inherently unreliable"). Rather, as the Commentary to the Guidelines notes, "[t]he estimate of the loss shall be based upon *available* information," and the sentencing court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, n.3(C)

(emphasis added).

The district court did just that in this case, and its estimate was supported by the evidence. The Government presented the testimony of OCG Inspector Nicole Creech, who testified that she was able to calculate the profits generated from the sale of unregistered pull-tab cards at Jackpot Charity Bingo during the undercover operations in March 2000 by multiplying the number of pull-tab cards played by the expected profit. According to Creech, the sale of unregistered pull-tab cards yielded an average profit of $40,000 per month. In accordance with the Guidelines' admonishment that the estimate take into account "factors[] such as the scope and duration of the offense," U.S.S.G. § 2B1.1, n.3(C)(v), the district court used this figure to calculate a total loss over a two-year period of $1.4 million.

As the Government correctly notes, the conservative method of extrapolation method used by the district court should weigh against our finding it unreasonable. The calculation is favorable to the Defendants in that the figure extrapolated to calculate the total loss was based solely on the unreported pull-tab cards. This figure did not take into account other methods employed by the Defendants to obtain and hide income, which included skimming bingo proceeds utilizing house players during bingo sessions. Also, the figure extrapolated to calculate the total loss was artificially low, as it took account of the fourth night of the OCG investigation. On this night, the OCG inspection was overt. OCG investigator Beverly Rogers testified that "sales went down drastically" on this night, and that OCG agents "had observed on the other nights [that the Defendants] sold lots and lots of pull-tabs, and [on] that night very few pull tabs were sold" after OCG inspector Dell Jones arrived at Jackpot to conduct an inspection. So proceeds from pull-tab cards detected on this night were presumably much less than normal. Given the sample's account of time during which

-17-

the Defendants were on notice of governmental surveillance, the overall estimate of the fraud loss was likely lower than a more precise estimate of the fraud loss. As a result, it cannot be said to be unreasonable on grounds that the district court's method of calculating loss *overestimated* the amount of the loss. We accordingly find no error in the district court's loss calculation.

## F. Disparity in Sentences

The Defendants argue that the district court penalized them for exercising their constitutional right to plead not guilty and go to trial. In support, they point to the disparity in their sentences and the sentences of the Adamses, their co-conspirators who pleaded guilty. While the Defendants were sentenced to 63 months' imprisonment, the Adamses were sentenced to three months' imprisonment after pleading guilty to one count of tax evasion.

First, because the Defendants' sentences are within the Guidelines, they are presumptively reasonable. *See Rita v. United States*, 127 S.Ct. 2456, 2464-66 (2007) (holding that a federal appellate court may apply a presumption of reasonableness to within-Guidelines sentences).

Second, legitimate reasons exist for the disparity between the Defendants' and the Adamses' sentences. The Defendants were found guilty of conspiracy to defraud the United States, tax evasion, and mail fraud. The Adamses pleaded guilty to one count of tax evasion. The Defendants received an enhancement for perjury while the Adamses received a deduction for acceptance of responsibility. Thus, it cannot be said that the Defendants and the Adamses are "similarly situated." *See United States v. Moore*, 240 Fed. App'x 699, 713 (6th Cir. 2007) (holding that where defendant went to trial while two co-defendants "accepted responsibility for their actions and pleaded guilty," the "three were not similarly situated," so "the district court had no basis for sentencing them similarly").

In any event, this Court has squarely held that sentencing disparities between co-conspirators

are reasonable when the "co-conspirators chose to plead guilty and cooperate with the prosecution." *United States v. Dexta*, 470 F.3d 612, 616 n.1 (6th Cir. 2006); *see also United States v. Valentin*, 239 Fed. App'x 674, 678 (2d Cir. 2007) ("[I]t is well established that the availability of a sentencing reduction for acceptance of responsibility cannot be interpreted as a punishment of defendants who maintain their innocence, nor does it otherwise derogate their rights.") (citing *United States v. Parker*, 903 F.2d 91, 105-06 (2d Cir. 1990)); *cf. United States v. Hamid*, 227 Fed. App'x 475, 480 (6th Cir. 2007) (holding that a great disparity was still reasonable even where the co-conspirators *did not* plead guilty, because there was no evidence that "[co-conspirators] were as or more culpable than [the defendant] or had as serious criminal histories as did [the defendant]"). We accordingly find no error in the Defendants' sentences.

## III. Conclusion

For the reasons stated above, we **AFFIRM** the Defendants' convictions and sentences.