NOT RECOMMENDED FOR PUBLICATION
**File Name: 17a0031n.06**
Case Nos. 15-5644/5653/5663

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff- Appellee, | ) | Jan 13, 2017 |
|  | ) | DEBORAH S. HUNT, Clerk |
| v. | ) |  |
|  | ) |  |
| SABRINA CARMICHAEL, NICHOLAS | ) | ON APPEAL FROM THE UNITED |
| GARNER, and ELI HOLLEY, | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| Defendants- Appellants. | ) | KENTUCKY |

**OPINION**

**Before: BOGGS, GILMAN, and DONALD, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Sabrina Carmichael, Nicholas Garner, and Eli Holley raise a number of issues relating to their guilty pleas and subsequent sentences for conspiring to commit wire fraud. Over the course of the conspiracy, the defendants advertised the sale of nonexistent automobiles on the internet. The victims then sent payments to the defendants for these vehicles, which the victims never received. Proceeds from these transactions were instead shared by the defendants and other members of the conspiracy.

The district court accepted the defendants' guilty pleas and sentenced them to prison terms based on their respective roles and involvement in the conspiracy. In addition, the court ordered the defendants to pay restitution to the victims. Carmichael and Garner appeal with respect to the amount of loss attributed to them and to the length of their sentences. Carmichael and Holley appeal the order of restitution. Garner alone argues that his waiver of counsel during

his sentencing hearing was in violation of his Sixth Amendment rights. For the reasons set forth below, we find no merit in any of these issues and therefore **AFFIRM** the judgments of the district court.

## I. BACKGROUND

The defendants' participation in this international conspiracy to commit wire fraud lasted from August 2010 through September 2012. As part of the conspiracy, the members created fictitious businesses in the United States and opened bank accounts using false identification documents. The members of the conspiracy then used these businesses to list automobiles for sale over the internet. Prospective purchasers, intending to buy the vehicles, transferred money into the bank accounts. Members of the conspiracy in the United States would then drain these accounts and, after keeping a portion of the money for themselves, wire the funds overseas to their European coconspirators. The prospective purchasers never received the vehicles that they intended to buy.

Garner and Holley were arrested in connection with the conspiracy on September 15, 2012. Carmichael was arrested three months later. The defendants all pleaded guilty to charges of conspiring to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349. By law, a conspiracy to commit wire fraud carries a maximum sentence of twenty years' imprisonment. 18 U.S.C. §§ 1343, 1349. One element used by the district court to determine the appropriate sentence for each defendant was the actual or intended loss attributable to each of them as a result of their fraudulent conduct. U.S.S.G § 2B1.1(b)(1). Before sentencing, therefore, the court held a series of evidentiary hearings to determine the amount of monetary loss attributable to each of the conspirators.

During the hearings, the government urged the court to estimate the loss by using data contained in a ledger found in the possession of Garner and Holley at the time of their arrest. This ledger described the conspirators' transactions from April 27, 2012 through September 11, 2012, totaling $1,301,132.31.  The United States extrapolated a daily average loss using this number, and then multiplied that daily average loss by the number of days each conspirator participated in the scheme.  Two objections to this proposed method of calculation were raised by the defendants: (1) it required the court to assume similar activity of the conspirators for the period not documented in the ledger, for which no proof had been submitted, and (2) it suggested that every act of every other conspirator was reasonably foreseeable to all members of the conspiracy.    The defendants offered an alternate calculation method based on verified transactions that occurred during the period outside the months documented in the ledger. Evidence was presented indicating that, during this period, the conspiracy engaged in $1,233,385.70 million in domestic transactions.  The defendants calculate a daily average for the loss attributable to the entire period of the conspiracy based only on that number.

The district court rejected both of these proposed calculation methods.  Because there was evidence of verifiable losses outside the period covered by the ledger, the court was not comfortable using only the ledger to estimate the loss attributable to each defendant.  On the other hand, the court concluded that the defendants' proposed method of calculation would grossly underestimate the amount of loss attributable to the conspiracy.  A third alternative to calculate the loss was therefore devised. The court added together the verified transaction amounts from the nearly six-month period represented in the ledger ($1,301,132.31) and the period of the conspiracy outside of that represented in the ledger ($1,233,385.70) and divided that number by the total number of days in the conspiracy.  This calculation led the court to

conclude that $3,370.37/day, or $2,534,518.01 over the course of the whole conspiracy, was a reasonable estimate of the total loss.

The district court then calculated the loss attributable to each defendant by multiplying the daily average loss ($3,370.37) by the number of days that each defendant was involved in the conspiracy. For example, Carmichael was active in the conspiracy for 489 days and therefore $2,079,598.02 of the loss (which includes an additional $431,487.09 in bank wires sent to foreign correspondents outside the period of the ledger) was attributed to her. Based partly on this loss figure, she was sentenced to 60 months' imprisonment for her role in the conspiracy. Garner was found to be active in the conspiracy for 710 days and thus responsible for $2,824,449.79 of the loss (with the same addition as for Carmichael). After this finding, but before his sentencing, Garner moved to dismiss his attorney. The court granted Garner's request, excused his counsel, and proceeded to sentence Garner to 240 months' imprisonment. Finally, Holley was found to have been involved in the conspiracy for 632 days, so $2,561,560.93 of the loss (again with the $431,487.09 addition) was attributed to her. She was sentenced to 36 months' imprisonment. After sentencing, the court held a restitution hearing, in which it determined that the victims' outstanding losses totaled $1,807,517.06. The court found all three defendants jointly and severally liable for this amount.

All defendants now appeal. Carmichael argues that the district court erred in determining the loss attributable to her and in finding that she was not a "minor participant" as defined in the Sentencing Guidelines. She also contends that the order of restitution is erroneous because the loss attributed to her was incorrectly calculated. Garner similarly challenges his sentence as procedurally and substantively unreasonable because the court improperly calculated the loss attributable to him and failed to consider the proper sentencing factors. He also alleges that the

court failed to determine whether his waiver of counsel was knowing and voluntary, in violation of the Sixth Amendment.  Finally, Holley challenges the order of restitution on the ground that the government did not meet its burden to show that the amount of restitution awarded was directly related to the crime.

## II.  ANALYSIS

### A.      Calculation of the loss attributed to Garner and Carmichael

We review the district court's findings of fact related to the loss attributed to the defendants under the clear-error standard.  *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006).  The methodology used by the district court to determine that loss is reviewed de novo. *Id.*

Garner and Carmichael both challenge the methodology used by the district court to calculate the loss attributed to them.  They first argue that the court's methodology was speculative and overestimated the amount of loss.  To support this assertion, the defendants point to the testimony of Dr. Arnold Stromberg, their expert witness.  Dr. Stromberg opined that the government's proposed methodology for calculating the loss did not have external validity because the period reflected in the ledger was not a random sample drawn from the entire conspiracy.

Despite the defendants' assertions, we conclude that the methodology adopted by the court to calculate the loss attributed to them was appropriate.  The district court was not required to estimate the amount of loss occasioned by this conspiracy with exact precision.  In fact, an exact calculation would be impossible, given that defendants used multiple aliases and successfully destroyed evidence of their transactions. *See United States v. Stoian*, 73 F. Supp. 3d 830, 835 (E.D. Ky. 2014).  Furthermore, when the "losses occasioned by financial frauds are not

easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information." *Triana*, 468 F.3d at 320. This reasonable estimation must be based on facts that are proved by a preponderance of the evidence. *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011) (holding that, when the amount of loss is in dispute, "the government must prove the loss amount by a preponderance of the evidence, or the district court may conduct judicial factfinding to determine the loss amount").

We conclude that the district court made a reasonable estimate of the loss in the present case. Because it was troubled by the "relative lack of data points outside of the time period described in the ledger," *Stoian*, 73 F. Supp. 3d at 836, the court did not adopt the government's proposed methodology, but instead fashioned its own methodology for calculating the loss. Taken into account were both the transactions described in the ledger and the verifiable losses that occurred outside of the period documented in the ledger. The court acknowledged that this result "could well be an underestimation of the loss attributable to the conspiracy." *Id.* at 838. In fact, the daily average of loss that the court ultimately extrapolated was "consistent with the lower range of daily loss amounts seen at the beginning of the period described in the ledger . . . along a curve which peaks with the highest amounts in the middle of that period, a trend also observed by Dr. Stromberg." *Id.* The court's detailed analysis was thus supported by the preponderance of evidence put forth by both parties.

The defendants also argue that the district court's methodology was inherently speculative. Extrapolation methods, however, are appropriate when "the fraud occurred over a long period of time, and a precise calculation of the loss is simply not feasible." *United States v. Tipton*, 269 F. App'x 551, 561 (6th Cir. 2008). This court has previously acknowledged that "[i]t is permissible for the sentencing court, in calculating a defendant's offense level, to estimate

the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *Id.* (quoting *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997) (per curiam)). In this case, the exact amount of loss is unknown, due in large part to the covert actions of the defendants. The district court therefore appropriately extrapolated the daily average loss occasioned by the conspiracy and arrived at a reasonable estimate based on a preponderance of the evidence.

Garner and Carmichael also dispute the losses specifically attributed to them. Garner argues that there is no causal link between his conduct and the daily average loss, while Carmichael argues that the district court credited her with too many days of involvement in the conspiracy. We find no merit in either of these arguments.

The district court correctly noted that "'[i]n the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity' shall be included in determining the proper loss amount for purposes of U.S.S.G. § 2B1.1(b)(1)." *Stoian*, 73 F. Supp. 3d at 838 (quoting U.S.S.G. § 1B1.3(a)). In making this determination, the court must make particularized findings as "to both the scope of the defendant's agreement and the foreseeability of his co-conspirators conduct." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (emphasis omitted).

The district court made both of these findings. In ascertaining the scope of Garner's and Carmichael's participation in the conspiracy, the court looked to their guilty pleas, in which both defendants accepted responsibility for "a conspiracy in which money and property were obtained by false and fraudulent sales of motor vehicles via the internet." *Stoian*, 73 F. Supp. 3d at 838 (internal quotation marks omitted). The actions of Garner and Carmichael also indicate that they were fully aware of the scope of the conspiracy. *See Campbell,* 279 F.3d at 400 (noting that,

"[i]n order to determine the scope of the defendant's agreement, the district court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others") (internal quotation marks omitted). Garner "was at the center of the activity in the United States" and provided instructions to his coconspirators about obtaining various identifications and opening fraudulent bank accounts. *Stoian*, 73 F. Supp. 3d at 841. Carmichael opened a number of fraudulent bank accounts and was left in charge of the American part of the conspiracy when Garner was out of town. *Id.* at 843.

Furthermore, both Garner and Carmichael were properly held accountable for the average daily loss attributable to the entire conspiracy during their days of active participation because the actions of their coconspirators were foreseeable. Garner's argument that he should be held responsible only for the losses represented in the ledger is unconvincing. We are similarly unpersuaded by Carmichael's assertion that she should not be held accountable for the days that she was at home in Georgia. The actions of their coconspirators were foreseeable to Garner and Carmichael given the scope of their participation in the conspiracy. The district court's findings as to the losses attributable to Garner and Carmichael are therefore reasonable estimations.

## B.  Garner's waiver of counsel

Our standard for reviewing a trial court's decision to allow the waiver of counsel remains unclear. *See United States v. Ross*, 703 F.3d 856, 866 (6th Cir. 2012). This court has "on occasion applied plain error review to examine the validity of a defendant's waiver of counsel." *United States v. McBride*, 362 F.3d 360, 365 (6th Cir. 2004) (citation omitted) (internal quotation marks omitted). Under plain-error review, Garner must show "a plain error that 'affect[ed] [his] substantial rights' and that implicated the 'fairness, integrity, or public reputation of judicial proceedings.'" *See United States v. Bankston,* 820 F.3d 215, 222 (6th Cir. 2016) (first alteration

in original) (quoting *Johnson v. United States*, 520 U.S. 461, 466–69 (1997)). Other cases in our circuit have applied a standard akin to de novo review, and have "omit[ted] discussion of the standard of review and proceed[ed] to engage in a thorough review of the colloquy between the district court judge and the defendant." *McBride*, 362 F.3d at 365. We need not decide which standard of review applies here, however, because Garner's claim fails under both.

The Sixth Amendment implies a right to self-representation. *Faretta v. California*, 422 U.S. 806, 821 (1975). But the trial court must ensure that a waiver of counsel is "knowing, voluntary, and intelligent" before allowing a defendant to exercise that right. *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). That is, "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

In *United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987), this court held, under our supervisory powers, that "whenever a federal district judge in this circuit is faced with an accused who wishes to represent himself in criminal proceedings, the model inquiry or one covering the same substantive points along with an express finding that the accused has made a knowing and voluntary waiver of counsel, shall be made on the record prior to allowing the accused to represent himself." *Id.* at 250. This model inquiry, derived from the Bench Book for United States District Judges, "is thirteen questions about the defendant's familiarity with the law and legal system, and the charges against him." *United States v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011). After making this inquiry, the district court is to give a "strong

admonishment that the court recommends against the defendant trying to represent himself or herself." *Id.* at 767.

Garner contends that the district court did not administer this inquiry before allowing him to represent himself. But in the post-*McDowell* era, this court has allowed the questions to be substantially similar to the model inquiry without requiring that they adhere literally to the recommended list of questions. *Bankston*, 820 F.3d at 226 (noting that "our disavowal of literal adherence to the model inquiry, means not only that each individual question need not be identical to one of the Bench Book questions, but also that the overall shortfall as compared to the thirteen questions need not be an error" (internal quotation marks and citations omitted)). Instead, this court has focused its review on whether "the judge addressed the 'relevant considerations' behind the model inquiry, such as 'the defendant's familiarity with the law, . . . the gravity of the charges and the dangers of self-representation,' and whether 'the defendant's decision to waive counsel is voluntary.'" *Id*. at 224 (quoting *United States v. Miller*, 910 F.2d 1321, 1324 (6th Cir. 1990)).

The district court engaged in a review process substantially similar to the model inquiry before allowing Garner to represent himself. Garner moved to dismiss his counsel before he was sentenced, but he was represented during his guilty plea and during the evidentiary hearing to determine the loss attributable to the members of the conspiracy. Many questions contained in the model inquiry, which cover topics related to the criminal-liability phase of trial, were therefore inapplicable to Garner. *See* Benchbook for the U.S. District Court Judges 1.02(c) (2013).

The district court nevertheless confirmed that Garner was competent, understood the nature of the sentencing proceedings, and was familiar with the rules governing his appeal.

Garner acknowledged that the loss attributed to him was already established and not subject to further review, except on direct appeal. The court questioned Garner in detail about his understanding of his right to file a direct appeal and the process for obtaining counsel for that appeal. Armed with this knowledge, Garner stated that he wanted to waive his right to counsel for the purposes of his sentencing.

The court excused Garner's counsel after expressly stating that "I think you're fully aware of what's going on, you know what the risk is, that you will be proceeding here today without counsel." Although this comment was not an explicit statement that Garner's waiver was "voluntary and knowing," we have previously held that "the requirement of an express finding is not a magic word test." *Bankston*, 820 F.3d at 226; *see also United States v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011) (holding that the district court's statements that "I find that you have the requisite knowledge, education and ability to represent yourself in this matter" and "You know what you want to do and so you are capable of doing that" constituted a valid finding of knowing and voluntary waiver).

We therefore conclude that Garner's waiver of counsel was knowing and voluntary. The district court addressed the relevant considerations embedded in the model inquiry during Garner's sentencing hearing and confirmed the knowing and voluntary nature of his waiver. Because Garner knew what he was doing and "made his choice with his eyes open," *see Faretta*, 422 U.S. at 835, his waiver of counsel was not a violation of his Sixth Amendment rights.

## C.     Garner's sentence

We typically review challenges to the reasonableness of a district court's sentencing decision using the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 56 (2007). The sentencing determination is reviewed for both procedural and substantive reasonableness.

*United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007). Garner challenges his sentence on both of these grounds.

In this case, however, we review Garner's claim of procedural unreasonableness for plain error because he did not properly preserve his objection on appeal. *See United States v. Bostic,* 371 F.3d 865, 872–73 (6th Cir. 2004). After Garner's sentence was imposed, the court asked him if he had any objections. Garner responded "Yes, sir. I do object," but he did not provide any basis for the objection. "If a party does not clearly articulate any objection and the grounds upon which the objection is based, when given this final opportunity to speak, then that party will have forfeited its opportunity to make any objections not previously raised and thus will face plain error review on appeal." *Id.* To demonstrate plain error, Garner must show an "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)). The third prong requires a determination that there was prejudice to the defendant. *United States v. Gabbard*, 586 F.3d 1046, 1051 (6th Cir. 2009) (per curiam).

Garner argues that the district court erred because it did not acknowledge his request for a sentence of time served and did not articulate its consideration of certain 18 USC § 3553(a) factors. This was not a clear error, however, because a sentencing judge is required only to "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). Here, the district court engaged in a discussion with the government and with Garner in relation to numerous § 3553(a) factors, including the nature and

circumstances of the offense, Garner's characteristics and criminal history, the need for deterrence, and the need to protect the public from further crimes. After hearing Garner's response, considering the factors enumerated under § 3553(e), and taking into account Garner's criminal history, the court imposed the statutory maximum sentence of 240 months' imprisonment.

Garner identifies no specific § 3553(a) factor that the district court failed to consider in making this determination. Furthermore, "[i]f the record demonstrates that the sentencing court addressed the relevant factors in reaching its conclusion, the court need not explicitly consider each of the § 3553(a) factors or engage in a rote listing or some other ritualistic incantation of the factors." *United States v. Kirchhof*, 505 F.3d 409, 413 (6th Cir. 2007). The record in this case establishes that the district court considered the § 3553(a) factors relevant to Garner's sentence. Garner has thus failed to show any error, much less plain error, stemming from his sentencing proceeding. The district court's sentence was therefore procedurally reasonable.

Garner also argues that his sentence is substantively unreasonable. We consider the totality of the circumstances when reviewing the substantive reasonableness of a sentence. *Gall*, 552 U.S. at 51. "The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010). "A sentence is substantively unreasonable if the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Id.* at 633 (quoting *United States v. Walls*, 546 F.3d 728, 736 (6th Cir. 2008)). Finally, "[f]or sentences within the Guidelines range,

we may apply a rebuttable presumption of reasonableness." *United States v. Johnson,* 640 F.3d 195, 202 (6th Cir. 2011).

Although Garner's sentence of 240 months' imprisonment was the statutory maximum, the Guidelines range calculated by the district court was 292 to 365 months. Where the Guidelines range is greater than the statutory maximum sentence, that sentence *is* the guideline sentence. U.S.S.G. § 5G1.1. The sentence imposed on Garner is thus entitled to a presumption of reasonableness. Garner nonetheless argues that his sentence is substantively unreasonable because it was grossly disproportionate to the sentences handed down to other members of the conspiracy and to sentences imposed on defendants charged with similar amounts of loss by other courts. But Garner's sentence was based on his leadership role in the conspiracy, his criminal history, and other § 3553(a) factors specifically relevant to him. In other words, his sentence was not arbitrary, based on impermissible factors, or the result of a failure to consider or properly weigh pertinent sentencing factors.

Although § 3553(a)(6) "identifies as one of the sentencing factors to be considered 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[,]' . . . this factor concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants." *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) (citation omitted) (emphasis omitted). Garner's argument that his sentence is grossly disproportionate to the sentences handed down by other courts on defendants charged with similar amounts of loss is undermined by the fact that he was given a sentence well below his calculated the Guidelines range. "Considering that one of the fundamental purposes of the Guidelines is to help maintain national uniformity in sentences, and considering that most sentences are within the Guidelines,

the Guidelines themselves represent the best indication of national sentencing practices." *United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2008). Garner's sentence, despite being the statutory maximum, was therefore not substantively unreasonable.

**D.     Carmichael's sentence**

We review a district court's denial of a mitigating-role adjustment to a defendant's offense level under the clear-error standard. *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010). Carmichael argues that the district court clearly erred when it found that she was not a minor participant in the conspiracy. If the court had found her to be a minor participant, Carmichael would have been eligible for a two-level reduction in her offense level under the Sentencing Guidelines. U.S.S.G. 3B1.2(b). This reduction "is available only to a party who is less culpable than most other participants and substantially less culpable than the average participant." *Lanham*, 617 F.3d at 888 (quoting *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir.1993)) (internal quotations omitted).

The record in the present case shows that Carmichael opened approximately five bank accounts using fraudulent passports, received money from victims, and forwarded those funds overseas. Furthermore, when Garner was out of town, Carmichael was left in charge and was responsible for manufacturing fraudulent identity cards. Carmichael does not dispute these findings, but instead argues that her actions were comparatively minor given the actions of the entire conspiracy, most of which occurred in Europe. We disagree. Carmichael's actions in the United States were significant and essential for the overall success of the international conspiracy. *See United States v. Salgado,* 250 F.3d 438, 458 (6th Cir. 2001) (holding that "[a] defendant who plays a lesser role in a criminal scheme may nonetheless fail to qualify as a

minor participant if his role was indispensable or critical to the success of the scheme, or if his importance in the overall scheme was such as to justify his sentence").

Carmichael's actions therefore do not render her less culpable than most other participants in the conspiracy, nor do they render her substantially less culpable than the average participant. Moreover, even if we were to conclude that the district court clearly erred in not giving Carmichael a role reduction, we have considerable doubt that her sentence would have been any different. Carmichael was sentenced to 60 months' imprisonment for her role in the conspiracy. She concedes that, even with a two-level reduction for a minor role, her sentence of 60 months' imprisonment would still be below the new Guidelines range that would have applied. We therefore find no error in Carmichael's sentence of 60 months' imprisonment.

### E.    Restitution order

An order of restitution is subject to two different standards of review. We review de novo whether a restitution order is permitted under the law. *United States v. Bogart*, 576 F.3d 565, 569 (6th Cir. 2009). The amount of restitution ordered by the district court, however, is reviewed under the abuse-of-discretion standard. *Id.* None of the defendants dispute that a restitution order was permitted under the law in this case, but Carmichael and Holley dispute the amount of restitution attributed to them. We therefore review their claims using the abuse-of-discretion standard.

The Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A(a)(1), requires that the defendants in this case make restitution to the victims of their crimes. For purposes of this statute, a victim is defined "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any

person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense lies with the government, and "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

The government's expert witness, Agent Allen Lowe, compiled information relevant to the victims' losses into a summary chart, which was introduced into evidence at a restitution hearing. This chart included the victims' names and contact information, the banks used by the victims, and the type of documentation supporting the victims' claims. Using this summary chart, Agent Lowe determined each defendant's liability based on the amount of time that they were deemed to be actively participating in the conspiracy. Separate charts were prepared for each defendant that reflected their individual liability. Carmichael and Holley were found to be jointly and severally liable for $1,807,517.06, which was the full amount of loss documented in the master restitution chart.

On appeal, Carmichael and Holley argue that the government did not meet its burden to connect the restitution amounts with sufficient particularity to the victims' claims. Holley specifically contends that the summary charts were not supported by the underlying information and faults the government for not introducing this evidence. She also maintains that the government should have specifically linked every victim's claim to the underlying evidence supporting their claims during the restitution hearing. Despite the defendants' assertions, however, we conclude that the district court did not abuse its discretion in adopting the government's summary charts.

This court has held that a summary chart, when supported by additional evidence, can be used by the government to establish losses for the purposes of restitution. *United States v. Sawyer*, 825 F.3d 287, 296 (6th Cir. 2016) (holding that, while it might be an abuse of discretion for the district court to rely solely on a summary report to prove restitution, the use of such a report was appropriate when it was supported by other evidence, such as testimony about the chart and documentation supporting the claims reflected in the report). In this case, the government provided a multitude of evidence to support the losses documented in the summary chart. Agent Lowe testified at length about how the summary chart was prepared and the government's investigatory efforts in collecting the underlying data reflected in the chart. In addition, documentation supporting these charts, such as the ledger and the victim-impact statements, was provided to the parties and to the district court before the restitution hearing. The court therefore did not abuse its discretion in concluding that the government "has borne the burden of demonstrating by a preponderance of the evidence that restitution is owed to those individuals identified by Agent Lowe and listed in the spreadsheets." *United States v. Stoian*, No. 12-CR-65-JMH, 2015 WL 1611792, at *5 (E.D. Ky. Apr. 10, 2015).

Carmichael also argues that the amount of restitution she was ordered to pay is incorrect because the loss attributed to her was improperly calculated. But for the reasons stated above, the loss attributed to her by the district court was supported by the evidence. Furthermore, "Section 3664(h) [of the MVRA] specifically empowers district courts to make individual defendants liable for all of the losses caused by multi-defendant crimes, and we have consistently affirmed such decisions in the conspiracy context." *Sawyer*, 825 F.3d at 295. The district court therefore did not abuse its discretion in holding Carmichael and Holley jointly and severally liable for the full amount of restitution attributed to the conspiracy.

### III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgments of the district court.