NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0263n.06

No. 23-1400

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 13, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| DOMINIQUE DIXSON, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE: KETHLEDGE, LARSEN, and BLOOMEKATZ, Circuit Judges.

BLOOMEKATZ, Circuit Judge. Dominique Dixson posted photos of himself in front of a gun range to his Instagram account. The photos caught the attention of federal agents who suspected Dixson was illegally shooting firearms despite his felony status. Surveillance footage confirmed this suspicion and officers obtained warrants to search Dixson's apartment and arrest him. In executing the warrants, police recovered a weapon and a high-capacity magazine. A jury convicted Dixson of two violations of being a felon in possession of a firearm and ammunition under 18 U.S.C § 922(g). On appeal, Dixson challenges the constitutionality of the searches and raises issues with his trial. Because these arguments lack merit, we affirm.

**BACKROUND**

In March 2019, Dominique Dixson and his then-wife, Ruby Dixson, visited Action Impact, a gun store and range in Eastpoint, Michigan. Dixson and his wife perused the store and picked out a nine-millimeter Taurus PT 111. Ruby Dixson purchased the gun using her husband's credit card. The two then left the store with the gun in tow.

The next day the couple returned to Action Impact to try out the new weapon at the range. Ruby Dixson entered the store carrying a small black bag with a Chrysler logo. Once inside, she reached into the bag and pulled out the Taurus she purchased the day prior. Dixson went up to the counter, bought a high-capacity magazine for Ruby's gun, and rented a second gun for himself. Dixson says that he chatted with a store employee who he claims told him it was legal to rent a firearm for use at the range even though he had a felony conviction. From there, the couple headed over to the on-site range where Dixson shot both the rental gun and his wife's Taurus. Back at home, Dixson posted photos of himself on Instagram holding up the practice targets he used at the range.

Several weeks later, Agent Rees, conducting an investigation for the Bureau of Alcohol, Tobacco, Firearms and Explosives, spotted an account titled @kiing_messiah, and identified it as Dixson's. He knew Dixson had a prior felony conviction. Agent Rees used an undercover Instagram account and was able to see Dixson's target-practice photos. He could not recall whether Dixson's account was set to "public" or "private." R. 197, Trial Tr., PageID 1272–74; R. 129, Evidentiary Hearing Tr., PageID 597. If the account was "public," Agent Rees would have been able to view Dixson's photos immediately. If it was "private," Dixson accepted the undercover account's request to follow him thereby giving Agent Rees access to see his photos. Either way, Agent Rees discovered the photos of Dixson with the practice targets.

Based on the Instagram photos, Agent Rees suspected Dixson of illegal firearm possession and reached out to the store for information. Dixson's two visits were captured on Action Impact's surveillance footage. Most notably, it depicted Dixson purchasing the high-capacity magazine and firing both the rented gun and his wife's Taurus. Agent Rees also spotted Dixson's paper target, which he identified as the same one in the photo posted to Instagram.

With this information, officers obtained a warrant to search Dixson's home for the weapon and ammunition. They also obtained a warrant to arrest him. Before officers entered Dixson's home, Agent Rees noticed that Dixson posted two more videos to his Instagram account. These videos depicted Dixson in his car holding what looked like a high-capacity magazine. Dixson posted the videos just hours before the police were set to execute the warrants.

When the police arrived, they first conducted surveillance outside of Dixson's apartment. They observed Dixson leaving his apartment and entering his car with a black Chrysler bag identical to the one his wife used to carry her Taurus. Shortly after Dixson drove away, officers pulled him over. They arrested him, drove his car back to the apartment, and searched it for weapons. They recovered the Taurus in the black Chrysler bag and a loaded high-capacity magazine—the same items as those depicted in the surveillance footage. Officers also found paper targets and additional magazines inside Dixson's home.

The Government charged Dixson with two counts of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Before trial, Dixson unsuccessfully moved to suppress the evidence obtained from Instagram that led to the eventual arrest and recovery of the weapon and ammunition. The court reasoned that if Dixson's Instagram account was public, he had no reasonable expectation of privacy in his account, and if his account was private, he consented to the search by allowing Agent Rees, via his undercover account, to view his photos. Dixson further moved to suppress the firearm and magazine recovered from his car. The district court denied this too. It ruled that the search was lawful under the automobile exception to the warrant requirement because the government had probable cause to believe the firearm would be inside the car. Finally, Dixson moved to dismiss his indictment based on entrapment-by-estoppel because a salesperson at the store purportedly told him it was lawful for him to rent a

firearm and use it at the shooting range. While the court was doubtful this theory of entrapment was cognizable, it concluded that Dixson could go forward with this defense and that it would address its merits after seeing the evidence at trial. The district court therefore denied this motion without prejudice and the case went forward.

Throughout the proceedings, Dixson asked the court to substitute five separate attorneys before ultimately asking to represent himself. The court granted this request after finding that Dixson's waiver of his right to counsel was knowing and voluntary. It also appointed his fifth counsel to serve as standby counsel.

To establish his entrapment defense, Dixson called three witnesses—none of whom were employed by Action Impact. This included his wife at the time, Ruby, and two of the investigating officers, Special Agent Mary Behler and Officer Michael Parisek. Mr. Solomon, the employee in the surveillance footage to whom Dixson spoke, was available to testify. But Dixson claimed that Mr. Solomon was not the employee who told him he could rent the firearm. As Dixson tells it, his interaction with the unknown employee was missing from the surveillance footage entirely. Because the district court determined that Dixson presented "zero evidence" of entrapment at trial, it declined to instruct the jury on the entrapment defense or allow Dixson to discuss it during his closing argument. R. 199, Trial Tr., PageID 1624. The jury found Dixson guilty, and the district court sentenced him to 120 months in prison. Dixson now appeals.

## ANALYSIS

Dixson challenges the district court's rulings for the government on his two Fourth Amendment suppression motions and his entrapment-by-estoppel defense. He also challenges the district court's grant of his waiver of the right to counsel and claims that he received ineffective

assistance by his standby counsel. Four of Dixson's five claims are meritless, and the fifth is premature.

## I.      Fourth Amendment Claims

Dixson brings two Fourth Amendment claims on appeal. He claims that the federal agents violated his right against an unreasonable search first by illegally obtaining information from his private Instagram account, and second by illegally searching his car without a warrant. Dixson argues that any evidence introduced as a result of those illegal searches should have been suppressed "as fruit of the poisonous tree." *Northrop v. Trippett*, 265 F.3d 372, 383 (6th Cir. 2001). Warrantless searches are "per se unreasonable under the Fourth Amendment," subject only to a few limited exceptions. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Relevant here is the automobile exception, which allows officers to search a car without a warrant if there is probable cause. *See, e.g.*, *United States v. Graham*, 275 F.3d 490, 509–10 (6th Cir. 2001).

We review the lower court's legal conclusions de novo and factual findings for clear error. *See United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015). The government bears the burden of showing that the warrantless searches of Dixson's Instagram account and car were reasonable. *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002). A probable cause determination is a mixed question of law and fact which we review de novo. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016).

### A.      Instagram Account Search

Prior to trial, Dixson moved to exclude the photos that led officers to obtain surveillance footage of the range and, ultimately, all the evidence that established Dixson's conviction. The district court denied that motion.

Dixson appeals this ruling on the theory that the warrantless search of his Instagram account, which he maintains was private at the time Agent Rees accessed it, violated the Fourth Amendment.[1] When an account is set to "private," an Instagram user can view basic profile information about another user—including the name and profile picture of the user—but cannot view content posted to the account unless the accountholder grants permission for a user to do so. R. 129, Evidentiary Hearing Tr., PageID 597. Thus, Dixson argues, he has a reasonable expectation of privacy in the contents of his Instagram account akin to the data and contents stored by a personal cellphone. *Cf. Riley v. California*, 573 U.S. 373, 403 (2014); *Carpenter v. United States*, 585 U.S. 296, 310 (2018).

Yet even if Dixson had a reasonable expectation of privacy in the account, he allowed Agent Rees to access the information. The district court found that even assuming Dixson's account was private, Dixson granted Agent Rees's fake Instagram account access to view his photos. And because the Fourth Amendment is not violated "[w]here valid consent is given," the evidence obtained as a result of the search could be used to establish Dixson's guilt. *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006). This is even true where, as here, an officer gains access to information acting undercover by using a fake Instagram account. *See United States v.*

---

[1] At the suppression hearing, Agent Rees could not recall exactly how he accessed Dixson's photos. But the government established that he could have only obtained the photo in one of two ways: either the account was private and Dixson invited him to view the photos or the account was public and he could view the photos by simply searching for Dixson's account. The district court found that under either scenario, the government did not violate the Fourth Amendment. On appeal, Dixson maintains his account was "private" and does not contend that there was a violation if his account was set to "public." Because the district court did not make a conclusive factfinding that the account was public, we consider Dixson's only argument on appeal, that because his account was private the search violated the Fourth Amendment. *See Miller v. Admin. Off. of Courts*, 448 F.3d 887, 893 (6th Cir. 2006) (citing *Bickel v. Korean Air Lines, Co.*, 96 F.3d 151, 153 (6th Cir. 1996)) (explaining that arguments not raised in the appellant's opening brief are waived).

*Pollard*, 215 F.3d 643, 648 (6th Cir. 2000). The district court appropriately declined to suppress the fruits of Agent Rees's search of the Instagram account.

### B.      Automobile Search

Likewise, Dixson contests the lawfulness of the automobile search that produced the weapon and ammunition supporting his conviction. But here, too, the district court correctly held that the government did not violate the Fourth Amendment in conducting its search. Under the automobile exception, "a vehicle may be searched, without any indication of exigency, if the searching officers have probable cause to believe that it contains instrumentalities or evidence of the crime." *Graham*, 275 F.3d at 510. Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017) (quoting *United States v. Brown*, 857 F.3d 334, 339 (6th Cir. 2017)).

The evidence at trial shows that the officers had probable cause to believe that the weapon Dixson was using at the gun range was in the car, so the search was reasonable. To start, the officers observed Dixson entering his car with what appeared to be the same black Chrysler bag as the one containing the Taurus caught on video at the gun range. Additionally, an officer saw Dixson move towards the glovebox and the back of the passenger seat—places where a firearm or magazine could be stored. Finally, just hours before the search, Dixson posted (and officers viewed) two videos on Instagram showing Dixson sitting in his car with what looked like the magazine he purchased at Action Impact. Together, the circumstances established probable cause for the officers to search Dixson's vehicle after arresting him.

Dixson argues that the warrant authorizing the search of his home did not include the car he was driving when he was stopped a few blocks from his apartment. But this is beside the point.

Under the automobile exception, so long as the government has probable cause to believe that evidence of the crime will be found in the car, the search is reasonable. *Graham*, 275 F.3d at 510.

## II. Entrapment-by-Estoppel

Next, Dixson argues that the district court improperly failed to instruct the jury on his entrapment defense. We review jury instructions for abuse of discretion. *United States v. Theunick*, 651 F.3d 578, 589 (6th Cir. 2011). Entrapment-by-estoppel occurs "when a government official tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime in reasonable reliance on the official's representation." *Id.* (quoting *United States v. Valentine*, No. 94–6195, 1995 WL 390322, at *6 (6th Cir. June 30, 1995)). Dixson argues that he was entrapped because one of the employees at Action Impact instructed him that he could shoot a firearm at the gun range despite his criminal background, and because the store advertised itself as fully compliant with state and federal law. Notwithstanding the question of whether this employee could be considered a government official, the district court declined to instruct the jury on the defense or even allow Dixson the opportunity to raise the issue in his closing argument because it determined there was "zero evidence" in the record to support the theory. R. 199, Trial Tr., PageID 1624.

On appeal, Dixson points to nothing in the record to establish this defense, including the name or identifying features of the employee he says he spoke to. The only employee the surveillance footage shows that Dixson spoke with was made available to testify. But Dixson declined to call him as a witness because he says a different employee instructed him that he could use the firearm at the range. Since Dixson failed to present evidence of his theory, the district court did not abuse its discretion in refusing to include a jury instruction on the defense. *See Theunick*,

651 F.3d at 590 (affirming a district court's decision not to instruct the jury on entrapment-by-estoppel because the defendant failed to establish a factual basis for the defense).

### III.     **Wavier of Right to Counsel**

Dixson next argues that the district court erred by allowing him to represent himself at trial. Our court has not yet settled on a standard of review to apply when reviewing a trial court's decision to allow a waiver of counsel. *United States v. Carmichael*, 676 F. App'x 402, 407–08 (6th Cir. 2017) (explaining that we have used both plain error and "a standard akin to de novo review"). Under either standard, however, Dixson's argument fails.

District courts must ensure a defendant's waiver of the right to counsel is knowing and intelligent. *Faretta v. California*, 422 U.S. 806, 835 (1975). This circuit has adopted a series of questions from the Bench Book for United States District Court Judges to guide this *Faretta* inquiry. *United States v. Cromer*, 389 F.3d 662, 680 (6th Cir. 2004). A court must substantially comply with this series of questions by addressing the defendant's familiarity with the law, the gravity of the charges, the dangers of self-representation, and the voluntariness of the decision to waive counsel. *Id.*

The district court did just that. At trial, when Dixson advised the court and his appointed counsel that he wished to represent himself, the court asked a series of questions. This included whether Dixson had any legal training and whether he understood that the government was represented by lawyers, that he had a serious disadvantage because he was not a lawyer, the charges were serious, and there was a potential for a long prison sentence. The court ended by asking Dixson whether, in light of this information, he still wished to represent himself. Dixson answered yes to everything.

Still, Dixson argues that the court should not have granted his request because of his mental illness, pointing to our decision in *United States v. Carradine*, 621 F.3d 575 (6th Cir. 2010). In *Carradine*, we upheld a trial court's denial of a defendant's request to represent himself because it found that he was not competent to do so. *Id.* at 578–79. But in that case, when the district court tried to assess whether the waiver of counsel was knowing and voluntary, the defendant appeared "obstinate and hostile," repeatedly interrupting the judge and stating that he did not understand. *Id.* at 577. Here, there's no evidence to indicate that Dixson was incompetent to represent himself at trial, and his brief points us to nothing in the record to make that showing. He merely argues that the district court should have asked about Dixson's mental state and whether he was impaired by psychotropic medications. Because the district court need not ask about a defendant's mental state and medications they may or may not be on, it did not err in allowing Dixson to represent himself at trial. *Cf. Carmichael*, 676 F. App'x at 408.

## IV.     Ineffective Assistance of Standby Counsel

Dixson's final claim is that he received ineffective assistance from his standby counsel. But we generally do not review ineffective assistance of counsel claims on direct appeal because they are more properly raised in post-conviction proceedings pursuant to 28 U.S.C. § 2255. *United States v. Gonzalez*, 501 F.3d 630, 644 (6th Cir. 2007). Deferring consideration of these claims allows the parties to develop a more adequate record. *United States v. Barrow*, 118 F.3d 482, 494 (6th Cir. 1997). This challenge involves a direct appeal from the trial court. And both cases Dixson cites, *Strickland* and *McKaskle*, are cases in which the Supreme Court reviewed ineffective assistance of counsel and standby counsel claims on collateral review. *See Strickland v. Washington*, 466 U.S. 668, 678 (1984); *McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984). Further, at present, there is little evidence to support Dixson's claim that his standby counsel jeopardized

his case. *See United States v. Valdez*, 362 F.3d 903, 913 (6th Cir. 2004) (noting that unless trial counsel's ineffectiveness was readily apparent from the record, post-conviction review is the more appropriate vehicle). As a result, we decline to review this claim now.

## CONCLUSION

We affirm and decline to consider the ineffective assistance of standby counsel claim on direct review.